GENE A. HEDLUND AND JANICE TUCKER, a.k.a. JANICE TUCKER HEDLUND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hedlund v. Commissioner
Docket No. 15804-90
United States Tax Court
T.C. Memo 1993-455; 1993 Tax Ct. Memo LEXIS 467; 66 T.C.M. (CCH) 914; September 29, 1993, Filed *467 Decision will be entered under Rule 155. For petitioners: Joseph E. Mudd. For respondent: Louis B. Jack and Dale A. Raymond. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1986 in the amount of $ 233,876 and additions to tax as follows: Sec. Sec. Sec. Sec. Sec.
6653(a)(1)(A)
6653(a)(1)(B)
6653(b)(1)(A)
6653(b)(1)(B)
6661
$ 4,716
[1]
$ 104,674
[2]
$ 58,469
Respondent determined that $ 139,565 of petitioners' underpayment was due to fraud and $ 94,311 of petitioners' underpayment was due to negligence. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues for decision are: (1) To what extent did petitioners receive income from constructive dividends by the payment of their personal expenses by Wood Dimension, Inc.; (2) whether either or both of petitioners are liable for the addition *468 to tax for fraud under section 6653(b) on any or all of the underpayment of tax, and, in the alternative, whether they are liable for the addition to tax for negligence on any portion of the underpayment for which they are not liable for the addition to tax for fraud; and (3) whether petitioners are liable under section 6661 for the addition to tax for a substantial understatement of income tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Gene A. Hedlund and Janice Tucker (a.k.a. Janice Tucker Hedlund) resided in Corona del Mar, California, at the time of the filing of their petition in this case. Petitioners were married during all of the year 1986 and filed a joint Federal income tax return for that year. At all times relevant hereto, petitioner Gene Hedlund was the registered owner of 100 percent of the stock of a corporation, Wood Dimension, Inc. (WDI). WDI was incorporated in the State of California in 1971. Originally, WDI was located in Redondo Beach, California, but moved to Torrance, California. From 1975 through 1989, WDI's principal place of business was at 227 E. Meats, Orange, California. WDI also did business *469 at 121 and 143 E. Meats in Orange. At all relevant times, WDI rented the real property located at 121, 143, and 227 E. Meats from Mr. Hedlund. From 1971 to 1989 WDI was in the business of manufacturing wood enclosures for stereo speaker systems and assembling speaker components. Mr. Hedlund was WDI's president until March 31, 1988, when Mrs. Janice Tucker Hedlund (Mrs. Hedlund) was elected president. Starting in November 1982, and, except for a short period in 1983 when Mrs. Hedlund was not employed by WDI, Mrs. Hedlund was WDI's chief financial officer. Mrs. Hedlund was also elected secretary of WDI on March 25, 1984. Mr. and Mrs. Hedlund were the sole directors of WDI after March 1984. At all relevant times, Mr. Hedlund's primary function at WDI was to oversee the production of the stereo cabinets and their sales. There were supervisors that helped Mr. Hedlund with these activities. Mr. Hedlund spent most of his working time supervising production and making sales. However, he also spent some time on the financial affairs of WDI. He reviewed and signed most of the checks issued by WDI. Mrs. Hedlund was in charge of WDI's office. She supervised the keeping of the books *470 and records and was responsible for the in-house accounting. In 1986 WDI had approximately 280 employees. In 1986 WDI manufactured 5,000 to 10,000 speaker cabinets in a day. In 1984 WDI began operating two shifts. Most of the speaker cabinets manufactured by WDI were sold to four Japanese companies. However, seconds and rejects that were not satisfactory to these companies, and occasionally other cabinets, were sold by WDI to a Mr. Perry. The number of cabinets sold to Mr. Perry varied from month to month. On certain occasions, Mr. Perry paid WDI for the cabinets he bought in cash. On its Federal income tax return for the fiscal year ended March 31, 1986, WDI reported that it had current earnings of $ 218,261 and unappropriated retained earnings of $ 1,056,510. On its Federal income tax return for the fiscal year ended March 31, 1987, WDI reported that it had current earnings of $ 90,580 and unappropriated retained earnings of $ 1,147,090. Petitioners' personal accountant was Mr. David Krajanowski, who was also WDI's accountant. Mr. Krajanowski is a certified public accountant and a partner of the accounting firm Singer, Lewak, Greenbaum & Goldstein (SLGG), of Santa Ana, *471 California. Petitioners' 1984 through 1987 Federal income tax returns were prepared by SLGG. SLGG prepared financial statements for WDI. Petitioners supplied SLGG with the information used to prepare WDI's financial statements. SLGG would prepare WDI's corporate income tax returns from its financial statements. SLGG prepared WDI's Federal corporate income tax returns for the fiscal years ending March 31, 1985 through 1988. SLGG conducted what is termed a review of the records of WDI, but not an audit. A review means that SLGG used financial information provided by WDI to prepare its financial statements, and SLGG did not independently verify the information it received from the officers or employees of WDI. Petitioners also supplied Mr. Krajanowski with information for preparing their individual Federal income tax returns. Mr. Hedlund has no formal training in accounting or bookkeeping. Mrs. Hedlund possessed sufficient knowledge of accounting that she could either answer questions asked by Mr. Krajanowski immediately or could find the answer after some research. Mr. and Mrs. Hedlund were married in February 1984. They went to Tahiti for their honeymoon and the cost of *472 the trip was paid by WDI. Prior to his marriage to the present Mrs. Hedlund, Mr. Hedlund was married to Nolene T. Hedlund. Mr. Hedlund and Mrs. Nolene Hedlund were divorced in January 1984. Their marriage produced the following children: Rick Hedlund, Jim Hedlund, David Hedlund, and Julie Hedlund Thomas. Mrs. Hedlund had two children from a prior marriage, Todd Tucker and Debbie Tucker. Mr. Hedlund and Mrs. Nolene Hedlund owned a house at 10926 Ridgeview Road in Villa Park, California, which had a swimming pool. This house was purchased in August 1980 and sold on July 1, 1986. During the year 1986 and for some prior years, Mr. Hedlund signed WDI checks paying for the servicing and maintenance of the swimming pool and knew that the checks were in payment for swimming pool care at the private residence on Ridgeview Road when he signed them. The payment of these items was charged on WDI's books to the manufacturing supplies account. Mrs. Nolene Hedlund sued Mr. Hedlund for divorce. In the divorce proceeding Mr. Robert Lemkin was Mr. Hedlund's attorney. Mr. Lemkin did not provide any legal services for WDI. As part of the divorce, Mrs. Nolene Hedlund was to receive a cash *473 settlement of around $ 1 million. In order to secure payment of the settlement, Mrs. Nolene Hedlund put a lien on the properties owned by Mr. Hedlund which were rented by WDI. An attorney named Edward Djang worked on the problems of the liens on the buildings owned by Mr. Hedlund but rented by WDI. About 90 percent of the work done by Mr. Djang, for which he was paid in 1986 by checks of WDI, related to liens put by Mrs. Nolene Hedlund on the buildings in which WDI operated. In 1986 Mr. Lemkin was paid for his legal services by WDI with checks signed by Mr. Hedlund. The checks of WDI with which Mr. Lemkin was paid were charged as an expense on WDI's books in the account for professional fees. Mr. Robert Edward Dartez (a.k.a. Brian Dartez), was employed by WDI from about July 25, 1984, to January 29, 1987. He commenced employment with WDI as its office manager. In October 1984 Mr. Dartez was promoted to comptroller. He performed bookkeeping and other financial services for WDI. Under Mrs. Hedlund's supervision, Mr. Dartez handled all of WDI's accounts relating to banking, accounts receivable, accounts payable, and payroll and drew, but did not sign, many of WDI's handwritten *474 checks. Prior to WDI's hiring Mr. Dartez, Mrs. Hedlund performed the services for WDI which were taken over by Mr. Dartez. When Mr. Dartez first arrived at WDI, Mrs. Hedlund instructed him on procedures and the duties of his position and, particularly, the accounts to which personal items of petitioners paid by WDI should be charged. Initially, Mr. Dartez would ask questions, but as time passed he performed his duties with minimal instructions. However, he consulted Mrs. Hedlund when in doubt as to the WDI account to charge with a personal item of petitioners' paid by WDI. Mr. Dartez had access to WDI's business records. The actual preparation of payroll checks was done by an outside payroll paycheck service. These checks were usually signed with a stamp containing Mr. Hedlund's signature. Mr. Dartez was authorized to use the stamp to sign payroll checks, but was not otherwise authorized to sign checks with Mr. Hedlund's name. As part of his duties, Mr. Dartez received all of the payroll reports from the payroll service. Although he did not prepare WDI's payroll tax returns, he signed them on behalf of the company. Mr. Dartez placed WDI's accounting system on computers *475 which he owned and leased to WDI. WDI also tested the stereo speakers by computer before packaging them. In 1986 WDI purchased new computers from AVT America, Inc., to replace the ones rented from Mr. Dartez. WDI at this time gave a computer which it had bought to Mrs. Hedlund's son Todd. WDI issued three types of checks: computer generated checks, handwritten checks, and payroll checks. The handwritten checks were usually written, but not signed, by Mr. Dartez from the time of his employment until his dismissal. Before Mr. Dartez was employed these checks were usually written by Mrs. Hedlund, and after Mr. Dartez' dismissal they were written either by Mrs. Hedlund or the bookkeeper. Mr. Hedlund signed most of the handwritten checks. When signing the handwritten checks, Mr. Hedlund would receive with the checks a copy of the invoice to which the check pertained. It was his usual practice to review the invoice before signing the check. The stamp containing Mr. Hedlund's signature (the stamp), which was used to execute checks, was kept in Mr. Dartez' desk while he was with WDI. Thereafter, the stamp was kept by Mrs. Hedlund, who had authorization to use the stamp as well as *476 to sign checks. Petitioners lived in their residence at 16715 South Pacific, Sunset Beach, California (Sunset Beach residence). Petitioners had cable television installed at the Sunset Beach residence. Life & Property Alarm System installed a smoke and fire detector module and an alarm light display unit at the Sunset Beach residence. The invoice for the work done by Life & Property Alarm System states that the cost of the work performed along with the new equipment was $ 3,000, of which payments of $ 1,250 and $ 875 had already been made. On September 5, 1985, WDI issued a check for $ 875 to Life & Property Alarm System and charged it on its books to security system expense. WDI paid other expenses incurred in connection with the Sunset Beach residence, such as the monthly fees for the cable television, the alarm system, and the cost of furniture. When Mr. Hedlund signed the WDI checks paying such expenses he knew they were in payment of expenses of the Sunset Beach residence. Mr. Joe Kiley washed the windows at the Sunset Beach residence and at WDI. WDI issued the following checks to Mr. Kiley and charged them to WDI's maintenance and repairs of buildings and grounds account: *477 Date
Check No.
Amount
June 6, 1986
11223
$ 55
July 24, 1986
11363
60
Aug. 7, 1986
11387
55
Aug. 29, 1986
11440
60
Sept. 4, 1986
11455
40
Sept. 18, 1986
11491
60
Oct. 3, 1986
11532
40
Oct. 16, 1986
11554
60
Nov. 6, 1986
11611
70
Nov. 21, 1986
11656
40
Dec. 4, 1986
11683
75
These payments from WDI represent payments for work being done at both WDI and the Sunset Beach residence. Mr. Hedlund knew this when he signed the checks. During 1985 and 1986, petitioners remodeled and enlarged the Sunset Beach residence. Prior to renovations, petitioners had an architect draw up plans. Jim Dean Construction was hired to do some of the remodeling work at the Sunset Beach residence. Mr. and Mrs. Hedlund, in their individual capacity, signed the contract for the remodeling. The first invoice for payment of the work performed by Jim Dean Construction was sent to petitioners at the Sunset Beach residence address. This invoice was paid, but Mrs. Hedlund requested that the invoices be sent to WDI. The reason given by Mrs. Hedlund to Jim Dean Construction for sending the invoices to WDI was that Mr. Hedlund was in the middle of a divorce and the Hedlunds wanted *478 to show that WDI was not making much money. Mrs. Hedlund gave Jim Dean Construction descriptions of items at WDI that could be claimed to have been worked on by Jim Dean Construction and then billed to WDI, even though no work on the items had actually been done. The only work connected with either WDI or petitioners done by Jim Dean Construction was being done on the Sunset Beach residence. Jim Dean Construction sent the following invoices for work done on the Sunset Beach residence to WDI with false descriptions of work performed for WDI: Date
Invoice No.
Amount
Oct. 31, 1984
1151
$ 38,000
Feb. 1, 1985
1185
24,982
Mar. 20, 1985
1219
23,970
WDI made payments for the work done by Jim Dean Construction as follows: Date
Check No.
Amount
Nov. 19, 1984
10036
$ 12,500
Dec. 18, 1984
10090
18,000
Mar. 20, 1985
10241
[1] 24,982
Apr. 15, 1985
10288
[2] 23,970
May 21, 1985
10339
23,970
The payments made in 1984 and on March 20, 1985, were claimed as deductions for equipment repair and maintenance on WDI's Federal income tax returns and *479 were disallowed by respondent. The final two payments were claimed as leasehold improvements on WDI's Federal income tax return for the fiscal year ending March 31, 1986, and were disallowed by respondent. Southern CaliforniaWood Windows performed work at the Sunset Beach residence. The total cost of the work done was $ 7,769.46. In June 1985, WDI paid $ 2,800 of that amount by check No. 10382 and charged the amount as an expense of WDI. Mr. Charles L. Theobald installed certain framing and performed other construction work at the Sunset Beach residence. WDI paid for the work with checks numbered 10432 dated July 22, 1985, and 10462 dated July 26, 1985, and the amount of the checks were charged to WDI's outside service-cost of goods sold account. During 1985 to 1987, Mr. Mark Jesse Wegner performed remodeling work at petitioners' Sunset Beach residence and at petitioners' buildings which were rented to WDI. WDI paid Mr. Wegner for his work with the following checks: Date Check No.
Amount
Apr. 16, 1985
10289
$ 4,306.00
June 6, 1985
10360
4,531.39
Nov. 19, 1985
10724
4,500.00
Apr. 21, 1986
11116
2,126.89
Mar. 3, 1987
11969
5,000.00
Mar. 20, 1987
12056
6,923.51
*480 The $ 2,126.89 paid to Mr. Wegner in 1986 was for masonry work at the Sunset Beach residence, but was shown on WDI's books as a corporate expense. Baumann Engineering was hired to help with renovations to the Sunset Beach residence. Specifically, Baumann Engineering dealt with the engineering aspects of the renovations. WDI paid Baumann Engineering the following amounts with the checks indicated and charged the payments to the corporate account indicated: Date
Check No.
Amount
Account Charged
Sept. 16, 1985
10568
$ 4,361.80
Professional fees
Dec. 10, 1985
10772
2,384.75
Professional fees
Jan. 8, 1986
10853
262.50
Professional fees
Mar. 24, 1986
11040
920.00
Outside service
Apr. 1, 1986
11059
425.00
Professional fees
All of the work covered by the above checks was done by Baumann Engineering only at the Sunset Beach residence of petitioners. Carpeting and rugs for the Sunset Beach residence were purchased from Hart's Rugs and Carpets. The following payments for carpets and rugs made to Hart's Rugs and Carpets by WDI were for carpets and rugs at the Sunset Beach residence, but with the payments charged to the WDI account indicated: Date
Check No.
Amount
Account Charged Dec. 2, 1985
10751
$ 2,700.00
Material purchases
Dec. 17, 1985
10801
1,396.55
Material purchases
Feb. 17, 1986
10945
1,916.43
Manufacturing supplies
Apr. 8, 1986
11085
90.00
[1] Maintenance supplies
*481 Nyland Plumbing & Heating Co. performed services at the Sunset Beach residence on February 6, 1986. On February 11, 1986, WDI paid Nyland Plumbing & Heating Co. $ 69.21 for the work performed and charged it to WDI's maintenance supplies account. On July 3, 1986, WDI paid $ 5,300 to Mr. Mel Murphy (d.b.a. Elegance in Time) for a grandfather clock which was delivered to the Sunset Beach residence and charged the payment to WDI's maintenance and repairs of equipment account. On October 8, 1986, WDI paid Von Hemert Interiors $ 3,160.39 for furniture delivered to the Sunset Beach residence and charged the payment to WDI's maintenance and repairs of equipment account. In 1986 Best Air Conditioning & Heating, Inc., installed a furnace in the Sunset Beach residence. By check dated October 21, 1986, in the amount of $ 1,200, WDI paid for the new furnace and charged the payment to WDI's maintenance and repairs of equipment account. By check dated November 5, 1986, in the amount of $ 1,827.97, WDI paid Grafton Street for china and fine glassware which was delivered to and used at the Sunset Beach residence. This payment was charged to WDI's manufacturing supplies account. Superdoors *482 performed work on some of the doors located at the Sunset Beach residence. On December 5, 1986, WDI paid Superdoors $ 1,963.58 for the work performed and charged this amount as a WDI expense. On December 8, 1986, WDI paid Lois Harding & Associates $ 5,212.29 for a window-display grouping of furniture selected by Mrs. Hedlund which was delivered to the Sunset Beach residence. This payment was charged to WDI's advertising expense account. The Sunset Beach residence was next to the Pacific Ocean. Petitioners hired Advance Glass & Screen, Inc., to install a glass windbreaker at the Sunset Beach residence. During 1986, WDI paid a total of $ 3,169 to Advance Glass & Screen, Inc., for the glass windbreaker and charged the payment as an expense of WDI. WDI issued the following checks to Dave's Interiors and charged the checks to the WDI account indicated: Date
Check No.
Amount
Account Charged Mar. 27, 1986
11057
$   556.00
Material purchases
Apr. 16, 1986
11108
1,000.00
Manufacturing supplies
Apr. 25, 1986
11139
203.26
Material purchases
Apr. 28, 1986
11147
1,000.00
Material purchases
June 5, 1986
11221
1,349.08
Material purchases
The items purchased *483 from Dave's Interiors were household items used by petitioners at their Sunset Beach residence. WDI paid California Glass Bending Corp. the following amounts for items for petitioners' Sunset Beach residence, which were charged to the listed WDI accounts: Date
Check No.
Amount
Account Charged Jan. 20, 1986
10883
$ 149.10
Material purchases
Feb. 20, 1986
10956
435.39
Manufacturing supplies
WDI paid C.M.F., Inc., the following amounts which were used at petitioners' Sunset Beach residence and charged the checks to the listed WDI accounts: Date
Check No.
Amount
Account Charged
Mar. 18, 1986
11020
$ 2,434
Manufacturing supplies
Mar. 20, 1986
11034
624
Manufacturing supplies
Petitioners commissioned Mr. Bradford Horn and Mr. William Brayton to carve an original wood sculpture of a great white heron on a log for the Sunset Beach residence. WDI paid a total purchase price of $ 3,500 for the sculpture, consisting of a $ 1,400 downpayment in 1986 and a $ 2,100 final payment made on March 19, 1987. The $ 2,100 payment was charged to WDI's outside service-cost of goods sold account. While Mr. Hedlund signed all the checks drawn on WDI that paid *484 for the remodeling of the Sunset Beach residence, Mrs. Hedlund selected the invoices for work done at the Sunset Beach residence to be paid by WDI. When Mrs. Hedlund selected the invoices for work at the Sunset Beach residence to be paid by WDI she knew the amounts were for personal expenses, and when Mr. Hedlund signed the WDI checks he knew the amounts were for personal expenses. Anything mailed to petitioners at their Sunset Beach address was picked up by them at the post office. In 1987 petitioners purchased a condo at 57 Mayfair Drive in Rancho Mirage, California, near Palm Springs (the condo). The condo was a three-bedroom townhouse with approximately 3,400 square feet. Power Carpets, Inc., installed carpet at the condo. In 1987 WDI paid Power Carpets, Inc., $ 2,500 and $ 5,743 for the carpet installed at the condo. WDI charged the amounts to its material purchases account. On March 19, 1987, WDI paid $ 9,034.70 to Ansdell Piano for a baby grand piano delivered to the condo. This expense was charged to WDI's material purchases account. By WDI checks numbered 11818, 11954, and 12057 dated February 22, 1987, February 26, 1987, and March 19, 1987, respectively, in the *485 amounts of $ 2,100, $ 4,059, and $ 1,127.50, respectively, WDI paid for remodeling of the condo. These remodeling expenses were charged on WDI's books to its account for outside service-cost of goods sold. By WDI checks numbered 11956 and 11999 dated February 26, 1987, and March 14, 1987, respectively, in the amounts of $ 2,000 and $ 4,982.29, respectively, WDI paid for the installation in the condo of an audio video system consisting of a stereo hi-fi VCR and a ceiling mounted projection TV with JBL sound (the entertainment system). Mr. Hedlund was aware that WDI paid for the remodeling of the condo and the entertainment system. In 1987 WDI purchased a membership in the country club at Rancho Mirage for petitioners. WDI did not deduct the cost of the membership, but put the membership on its books as an asset. The club's records indicate that petitioners played golf with five guests during 1987 and 1988. The following Citibank credit card accounts were issued to Mrs. Hedlund: Mastercard, account No. 542418-0086-339469, and Preferred Visa, account No. 4271-3824-0329-2119. Originally, the monthly statements for the Citibank Mastercard were billed to Mrs. Hedlund at the Sunset *486 Beach residence. Starting after the statement dated September 29, 1986, the monthly statements for the Mastercard were sent to Mrs. Hedlund at 227 E. Meats, Orange, CA 92665-3311. The monthly statements for the Visa card were sent to Mrs. Hedlund at the Sunset Beach residence until the statement dated August 20, 1986, when they began to be sent to Mrs. Hedlund at 227 E. Meats, Orange, CA 92665-3311. American Express issued credit card account No. 3782-633111-61002 in the name of Gene A. Hedlund/Wood Dimension, Inc. Monthly statements for this American Express account were sent to Mr. Hedlund at WDI's address. American Express issued credit card account No. 3782-633111-61010 in the name of Janice Hedlund/Wood Dimension, Inc. Monthly statements for this American Express account were sent to WDI's address. WDI made the following payments on American Express account No. 3782-633111-61010 on the dates indicated: Date of Payment
Check No.
Closing Date of Bill
Amount
Nov. 13, 1985
10700
Nov. 4, 1985
$ 1,193.49
Dec. 13, 1985
10783
Dec. 5, 1985
1,166.74
Feb. 12, 1986
10937
Feb. 5, 1986
12,470.92
Mar. 18, 1986
11019
Mar. 6, 1986
3,420.79
Apr. 15, 1986
11106
Apr. 7, 1986
1,435.73
May 15, 1986
11188
May 6, 1986
2,037.19
July 14, 1986
11340
July 7, 1986
4,187.28
Sept. 26, 1986
11507
Sept. 6, 1986
9,242.58
Oct. 21, 1986
11565
Oct. 6, 1986
3,111.89
Nov. 17, 1986
11634
Nov. 6, 1986
2,841.98
Dec. 17, 1986
11725
Dec. 5, 1986
2,365.85
*487 WDI made the following payments on Citibank Preferred Visa account No. 4271-3824-0329-2119 on the dates indicated: Date of Payment
Check No.
Closing Date of Bill
Amount
Sept. 25, 1985
10588
Sept. 19, 1985
$ 2,453.36
Oct. 30, 1985
10672
Oct. 21, 1985
1,649.69
Nov. 26, 1985
10741
Nov. 4, 1985
2,941.45
Jan. 2, 1986
10829
Dec. 18, 1985
4,265.51
Feb. 3, 1986
10908
Feb. 5, 1986
2,956.94
Feb. 25, 1986
10965 ?
2,575.48
Apr. 2, 1986
11068
Mar. 20, 1986
2,308.55
Apr. 22, 1986
11128
Apr. 18, 1986
1,998.31
May 29, 1986
11214
May 20, 1986
1,715.34
July 1, 1986
11295
June 19, 1986
3,115.13
Aug. 4, 1986
11381
July 22, 1986
5,298.15
Aug. 26, 1986
11426
Aug. 20, 1986
1,841.00
Sept. 26, 1986
11512
Sept. 19, 1986
3,477.55
Oct. 27, 1986
11594
Oct. 21, 1986
2,040.93
Dec. 4, 1986
11676
Nov. 19, 1986
3,110.38
Dec. 23, 1986
11761
Dec. 19, 1986
4,050.56
WDI made the following payments on Citibank Mastercard account No. 542418-0086-339469 on the dates indicated: Date of Payment
Check No.
Closing Date of Bill
Amount
Aug. 1, 1985
10468
July 29, 1985
$ 93.86
Sept. 5, 1985
10537
Aug. 28, 1985
770.57
Dec. 12, 1985
10782
Nov. 27, 1985
384.48
Jan. 6, 1986
10844
Dec. 29, 1985
932.79
Feb. 5, 1986
10913
Jan. 28, 1986
1,683.25
March 11, 1986
10998
Feb. 27, 1986
745.47
April 8, 1986
11086
Mar. 28, 1986
307.93
May 8, 1986
11165
Apr. 28, 1986
706.72
June 10, 1986
11229
May 29, 1986
514.86
July 14, 1986
11324
June 27, 1986
501.39
Aug. 4, 1986
11382
July 29, 1986
534.01
Sept. 9, 1986
11467
Aug. 28, 1986
2,165.43
Oct. 21, 1986
11572
Sept. 29, 1986
264.72
Nov. 6, 1986
11606
Oct. 29, 1986
1,805.57
Dec. 4, 1986
11675
Nov. 27, 1986
2,446.64
*488 A review of the bills for the charges on credit cards paid by WDI show that several of the charges were at stores such as Abercrombie & Fitch, Johnson & Murphy, and The Limited, which are stores that mainly feature clothes. The amounts paid by WDI on charges to American Express credit card account No. 3782-633111-61002 were claimed by WDI on its corporate Federal income tax returns as business expense deductions, but were disallowed by respondent. The amounts paid by WDI to Citibank for credit card charges for Citibank Preferred Visa account No. 4271-3824-0329-2119 were claimed by WDI on its corporate Federal income tax returns as business expense deductions, but were disallowed by respondent. During the 1986 calendar year, WDI paid $ 12,608.78 to Citibank for credit card charges for Citibank Mastercard account No. 542418-0086-339469. The amounts of these payments were claimed by WDI on its corporate Federal income tax returns as business expense deductions, but were disallowed by respondent. During 1984, 1985, 1986, and 1987, it was Mrs. Hedlund's regular practice to have WDI pay her personal credit card expenses. Prior to her marriage to Mr. Hedlund, WDI did not pay any of *489 Mrs. Hedlund's personal expenses, but it did pay personal expenses of Mr. Hedlund and his former wife. WDI checks numbered 11207 and 11253, dated May 27, 1986, and June 17, 1986, respectively, are made payable to Bullock's in the amounts of $ 418 and $ 4,322, respectively. Both checks contain the annotation that they are for "358 28 503 21". The signature on these checks is Mr. Hedlund's. Mr. Hedlund knew that some of Mrs. Hedlund's charges at Bullock's were being paid by WDI and that WDI did not purchase things from Bullock's. Mrs. Hedlund regularly purchased clothing and other personal items at J.W. Robinson's, a department store, and she had a charge account at the store. Mrs. Hedlund's J.W. Robinson's bill for April 1987 was paid by a WDI check. On June 29, 1984, Mrs. Hedlund purchased a 1980 Rolls Royce Corniche convertible automobile (the automobile) from Sterling Motors, Ltd. The purchase contract states that the buyer is "Janice M. Tucker" of 16715 S. Pacific St., Sunset Beach, Cal. Mrs. Hedlund signed the purchase contract. The total purchase price, including taxes and related expenses of the automobile, was $ 100,739.20. As part of the consideration given to purchase *490 the automobile, the seller, Sterling Motors, Ltd., received a downpayment of $ 27,739.20 and Mrs. Hedlund's 1977 280Z Datsun (I.D. No. GHLS30070255), valued at $ 3,000. The remaining $ 70,000 was financed through a loan with Sterling Savings & Loan Association (the loan). On December 17, 1984, WDI paid $ 1,274 to Sterling Motors, Ltd. for California department of motor vehicle fees for the automobile. During all relevant times, the automobile was registered in Mrs. Hedlund's name. In September 1985 WDI issued a check to Mrs. Hedlund in the amount of $ 45,663.97, and assumed the loan on the Rolls Royce with a balance of $ 64,876.02. WDI made two entries in its books to record the automobile as an asset of WDI. The automobile was sold to Gregg Motors, Ltd. for $ 65,000 on February 3, 1986. The sales contract indicates that the seller was Mrs. Hedlund. As consideration for the automobile, Gregg Motors, Ltd. issued check No. 2464, dated February 5, 1986, in the amount of $ 50,892.21, payable to Union Bank for the purpose of purchasing a cashier's check to pay off the then remaining loan balance owed to Sterling Savings & Loan. The stub for check No. 2464 stated that the automobile *491 was registered to "Janice M. Tucker". A second check was issued by Gregg Motors, Ltd. on February 11, 1986, payable to Mrs. Hedlund in the amount of $ 14,107.79. Mrs. Hedlund deposited the check from Gregg Motors, Ltd. in Bank of America account 09849-05803. Account 09849-05803 at Bank of America was a personal checking account in the name of Janice Tucker Hedlund. On its Federal income tax return for its fiscal year ending March 31, 1986, WDI reported that it purchased the automobile in September 1985 for $ 100,721 and sold it in February 1986 for $ 49,959. WDI claimed an ordinary loss of $ 50,762 from the sale of the automobile. The $ 14,107.79 that Gregg Motors, Ltd., paid directly to Mrs. Hedlund was not reflected in the gross sales price of the automobile on the corporate return. In the notice of deficiency to petitioners in this case, respondent did not assert that petitioners had received a constructive dividend from the above transactions concerning the automobile. By an Amendment to Answer respondent alleged that the $ 14,107.79 paid to Mrs. Hedlund was a constructive dividend to her from WDI. On June 24, 1986, WDI purchased 21 gold kruggerands from Bob Patchin's *492 Coin Gallery, Inc., for $ 7,287. WDI paid for the kruggerands by a check and the amount was charged to WDI's cost of goods sold account. On December 9, 1986, WDI purchased another 25 gold kruggerands from Bob Patchin's Coin Gallery, Inc., for $ 9,800. The purchase price was paid by a WDI check and the amount of this check was charged to WDI's public relations expense account. The kruggerands were kept in Mr. Hedlund's desk drawer. For the school year 1986-1987, Todd Tucker attended Monte Vista Christian School. By check No. 11155, dated May 6, 1981, WDI paid $ 8,100 to the school for Todd's registration and tuition. Mrs. Hedlund told Mr. Dartez to draw WDI's check to pay the bill. Mr. Hedlund signed WDI's check No. 11155 with which the tuition bill was paid. The amount of this check was charged to WDI's manufacturing supplies account. Mrs. Hedlund sent Monte Vista a letter dated May 6, 1986, requesting that bills be sent to petitioners at WDI's address. WDI also paid for some of Todd's travel to and from school, along with petitioners' travel to visit Todd. All or some of the expenses of the following vacation trips of petitioners were paid for by WDI: (1) Trip to Hawaii *493 in June 1984; (2) cruise on the S.S. Azure Seas in June 1984; (3) trip to Lake Tahoe in October 1984; (4) trip to Hawaii in April 1985; and (5) trip to the Virgin Islands in December 1985. While on the trip to the Virgin Islands, petitioners purchased a $ 7,800 ring from H. Stern Jewelers, which was charged to the American Express account No. 3782-63111-61002. On February 12, 1986, WDI paid the American Express bill upon which this charge appeared. WDI charged this $ 7,800 payment to its manufacturing supplies account. Four airline tickets purchased on June 27, 1986, from Northwest Airlines, were charged to petitioners' American Express account and paid for by WDI. These tickets were for personal trips. Also charged as part of a personal trip was $ 17.90 charged at the Skyview Terrace and $ 218.66 at the Airport International Inn. Both charges were for personal expenses. All these items were American Express charges paid by WDI. In the late seventies, Mr. Hedlund began to raise horses and at one time owned as many as 22 horses. The horses were kept at different ranches. Some of the ranches were in Texas and some in New Mexico. Two of the ranches were the Phillip's Ranch *494 near Dallas and the Blakeman Ranch near Fort Worth. The following amounts charged to American Express account 3782-63111-61002 and paid for by WDI were related to the horse business: Date
Description
Amount
Mar. 10, 1986
American West Airlines
$ 276.00
Apr. 17, 1986
Host International
21.20
Apr. 18, 1986
Best Western-Lexington
71.00
Apr. 19, 1986
TWA-Nashville
439.00
Apr. 19, 1986
TWA-Nashville
439.00
Aug. 12, 1986
American West Airlines
294.00
Sept. 25, 1986
Green Oaks Inn-Fort Worth
80.03
The March 10, 1986, charge to American West Airlines was for a ticket to Santa Ana, Phoenix, and Albuquerque. The August 12, 1986, charge to American West Airlines was for a ticket to Albuquerque. The following expenses were charged to American Express account No. 3782-63111-61002, paid by WDI, and involve travel to Dallas, Texas: Date
Description
Amount
May 3, 1986
National Car Rental
$  23.05
May 1, 1986
Dobbs House-Restaurant
23.00
May 2, 1986
Jet America
290.00
May 2, 1986
Jet America
290.00
July 18, 1986
Delta Airlines
347.00
July 18, 1986
Delta Airlines
347.00
July 18, 1986
National Car Rental
44.50
Nov. 11, 1986
Jet America
578.00
Nov. 11, 1986
Jet America
578.00
Nov. 15, 1986
National Car Rental
67.10
*495 WDI paid for flowers sent by petitioners to various relatives. On June 12, 1986, WDI issued check No. 11240 to Jeff Leibfreid in the amount of $ 5,900. WDI charged its material purchases account for the amount of check No. 11240. The $ 5,900 paid by WDI to Mr. Leibfreid was for a 1981 convertible Volkswagen Rabbit (the Rabbit). Frazier Auto Upholstery, Inc., installed a convertible top on the Rabbit in December 1986. WDI paid for the new roof with check No. 11720, dated December 16, 1986, in the amount of $ 508.80. This amount was charged to one of WDI's auto expense accounts. The Rabbit was given to Mrs. Hedlund's daughter. Petitioners and their children obtained the dental services of Tash Takeyasu, D.D.S., Inc. WDI paid for dental work performed with check No. 11663 dated November 25, 1986, in the amount of $ 200 and check No. 11771 dated January 5, 1987, in the amount of $ 145. Les O. Starnes is a dentist who created a study model for Debbie. WDI paid for the study model with check No. 11649 dated November 19, 1986, in the amount of $ 40. Among the amounts included in respondent's determination as personal items of petitioners paid by WDI in 1986 are: (1) A $ 1,000 *496 check to Duncan Sato of Hitachi Sales, a customer of WDI; (2) a check for $ 1,035.40 to Budd Brunn-Poly Sales, a company from which WDI bought polyurethane; and (3) a payment of $ 2,200 to Jerry Huto for an ornamental gate. There was a small metal gate at petitioners' Sunset Beach residence and a much larger one on the premises of WDI. Among the credit card charges of petitioners paid by WDI in 1986, are the following: uniforms for $ 201.40, safety equipment for $ 124.88, purchase of a telephone for $ 331.08, limousine service for $ 972.65, carry-out food for $ 602.54, and charges for an order for flowers of $ 268 and another order for flowers of $ 104.49. In January 1987 Mr. Dartez was fired. After he was fired Mr. Dartez contacted the Internal Revenue Service (IRS) to discuss possible violations of the tax laws by WDI and Mr. and Mrs. Hedlund. Specifically, Mr. Dartez claimed to have information of personal expenses of Mr. and Mrs. Hedlund being paid by WDI and being deducted by WDI. WDI and Mr. and Mrs. Hedlund filed a suit against Mr. Dartez in the Superior Court of the State of California in Orange County, case No. 52-03-43, alleging that after Mr. Dartez was fired, he *497 removed some of WDI's financial records without authority. WDI and Mr. and Mrs. Hedlund sought recovery of the records and documents that Mr. Dartez allegedly took. Mr. Dartez denied these charges and countersued, alleging that WDI had failed to pay the 10-percent commission that he had been promised by Mr. Hedlund. WDI and Mr. and Mrs. Hedlund denied the allegations in the counter suit. After Mr. Dartez left WDI, WDI was unable to use the computers for keeping its records and for a while had to resort to using handwritten journals and ledgers. Mr. Dartez died on or about October 29, 1991. Respondent, in the notice of deficiency, determined that during 1986 petitioners had unreported income from payments by WDI of their personal expenses of $ 467,951, and that the underpayment of tax resulting from the failure to report the following items was due to fraud: Description
Amount
Masonry work by Mark Wegner
$  2,127
Gold kruggerands
17,087
Glass windbreaker installed at
Sunset Beach residence
3,169
Furniture used at Sunset Beach
residence
22,707
China and glassware from Grafton St.
1,828
Credit card activity
104,605
Other miscellaneous personal
expenses paid by WDI
127,807
Dividend exclusion
(200)
Total
279,130
*498 Respondent in the notice of deficiency determined, in the alternative, that any amount of underpayment by petitioners which was shown not to be due to fraud was due to negligence. In the notice of deficiency respondent determined that petitioners received income in 1986 in the amount of $ 188,621 due to the payment by WDI of lawsuit expenses. The underpayment of tax resulting from this determination was determined by respondent to be attributable to negligence. Respondent, prior to the trial, conceded that the lawsuit expenses of $ 188,621 paid by WDI was not income to petitioners in 1986. By amendment to answer respondent alleged that petitioners received income of $ 14,107.79 from the check to Mrs. Hedlund from Gregg Motors, Ltd. in connection with the purchase by Gregg Motors, Ltd. of the Rolls Royce and that the failure to report this income was due to fraud. Each party has conceded certain adjustments made in the notice of deficiency, leaving in issue with respect to items of income only: (1) Whether $ 17,087 representing the kruggerands purchased by WDI in 1986 was income to petitioner, (2) whether $ 17,997 of the amounts determined by respondent to be income to petitioners *499 from improper charges to cost of goods sold and general and administrative expenses by WDI, was in fact payment of petitioners' personal expenses, and (3) whether $ 53,193 of the amounts paid by WDI in 1986 for petitioners' credit card purchases was for personal expenses and properly determined to be income to petitioners. [1]
*500 Petitioners contest the fraud in its entirety, but in the alternative argue that there is no fraud with respect to the kruggerands purchased, many of the items charged to credit cards which were paid by WDI, both those conceded to be income and those not conceded to be income, and a number of the items paid by WDI and charged to cost of goods sold and general and administrative expenses, particularly certain of petitioners' charges for entertainment, travel, and charges to petty cash. OPINION Sections 301(a) and 301(c)(1) require the inclusion in a taxpayer's gross income of amounts received as dividends. See also sec. 61(a)(7). Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year". A dividend may be either formally declared or may be "constructive". A constructive dividend can exist even when a corporation has not formally declared a dividend, and the fact that the corporation did not intend to confer a dividend is not determinative. Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir. 1966), *501 affg. T.C. Memo. 1965-84. It is well settled that payments by a corporation for the personal benefit of a shareholder may result in the receipt by the shareholder of a constructive dividend. Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). Where a controlling shareholder diverts corporate income to himself, without intention of repayment, it is proper to regard such diverted funds as constructive dividends for tax purposes. Greenspon v. Commissioner, 23 T.C. 138, 151 (1954), affd. 229 F.2d 947 (8th Cir. 1956). A corporate expenditure will be considered a constructive dividend to the extent of the accumulated and current earnings of the corporation, if: (1) The expense is nondeductible to the corporation; and (2) the expense confers some economic gain, benefit or income upon a shareholder. P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987), affg. T.C. Memo. 1984-549. Here the retained earnings of WDI were well in excess of the amount respondent determined to be dividends *502 to petitioners. The fact that an expenditure does not meet the section 274 substantiation requirements so as to allow a corporation to deduct the amount of the expenditure does not necessarily make the payment dividend income to the shareholders. Ashby v. Commissioner, 50 T.C. 409, 417-418 (1968). To be considered a constructive dividend, the expenditure must pass the two-part test mentioned above for constructive dividends. See United States v. Gotcher, 401 F.2d 118, 121-124 (5th Cir. 1968). Respondent in the notice of deficiency determined that certain payments by WDI were constructive dividends to petitioners, and the burden is on petitioners to show error in this determination. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent in an amendment to answer alleged that the $ 14,107.79 paid to Mrs. Hedlund by Gregg Motors was a constructive dividend from WDI to petitioners. Since this issue was raised by respondent in an amendment to her answer, respondent bears the burden of proof on this issue. Rule 142(a); Beek v. Commissioner, 80 T.C. 1024, 1033-1034 (1983), *503 affd. 754 F.2d 1442 (9th Cir. 1985). There was testimony by Mrs. Hedlund with respect to a number of items paid by WDI which respondent determined to be dividends to petitioners. In many instances Mrs. Hedlund was unsure as to what the amount paid represented. Much of her testimony was general. We have considered Mrs. Hedlund's entire testimony. All but a few of the items Mrs. Hedlund testified were for the benefit of WDI were based on guesses by Mrs. Hedlund and her testimony has no factual basis. Her testimony with respect to the following items, though weak in some respects, was sufficient when considered in conjunction with other facts in the record to persuade us that these items were corporate items and, therefore, not income to petitioners, even if the corporate records were not sufficient to establish that they were deductible by the corporation: (1) A check for $ 1,000 to Duncan Sato of Hitachi Sales, a customer of WDI; (2) a check for $ 1,035.40 to Budd Brunn-Poly Sales, a company from which WDI regularly made purchases; (3) a payment of $ 2,200 to Jerry Huto for an ornamental gate. The record shows there was a large ornamental gate on WDI's *504 premises and only a small gate, which would not ordinarily be considered ornamental, at petitioners' personal residence; (4) credit card payments for uniforms of $ 201.40, for safety equipment of $ 124.88, and a telephone for $ 331.08. The use of these items by WDI was shown and there was no apparent use for these items by petitioners; (5) limousine costs of $ 972.65, carry-out food for $ 602.54 and flowers totaling $ 372.49. Mrs. Hedlund testified that the only use of limousines was to transport officers and employees of its customers, particularly those visiting from Japan. From the description on the charges for the limousine services which were paid by WDI, this appears to be a fact. Mrs. Hedlund testified that carry-out food was purchased only when business visitors were at the WDI offices and, from the amount of the individual charges, this appears to be the case. Although the record shows many charges for flowers for petitioners' personal use paid by WDI, two large flower charges, one for $ 268 and one for $ 104.49, appear to be for office use of WDI when petitioners were entertaining office visitors. Clearly the $ 14,107.79 received from Gregg Motors, Ltd. was income *505 to Mrs. Hedlund. In 1985 Mrs. Hedlund had been paid by WDI the entire amount she paid for the Rolls Royce. Whether this was or was not a sale of the car to WDI, she had no basis left in the car. Therefore when she received the $ 14,107.79 in 1986, it was income to her. Either it was a dividend to her or her husband, if it was done with his knowledge and consent, or income to her from a misappropriation of funds from WDI. Petitioners have not shown that respondent erred in determining that all other items still in issue were for petitioners' benefit and dividends to them. Therefore, we conclude that the above-listed items did not represent income to petitioners, but sustain respondent's determination as to the other items which she has not conceded. Petitioners argue that since Mr. Hedlund owned all the stock of WDI the amounts could be dividends only to him. Petitioners filed a joint Federal income tax return and, therefore, each is liable for the tax on the income of either. Also, WDI paid bills of Mrs. Hedlund's with the knowledge and consent of Mr. Hedlund. Therefore, if these amounts are not dividends to her, they are dividends to Mr. Hedlund because he had payments *506 made for her benefit. Since, because of the joint return, it is immaterial whose dividends the payments represented, we need not discuss respondent's argument that petitioners did not raise this issue until brief. Section 6653(b)[2] imposes an addition to tax for fraud by a taxpayer. The Tax Reform Act of 1986 made changes to the addition to tax for fraud. One of the changes made to the addition to tax for fraud was that where a portion of an underpayment is shown to be attributable to fraud, a taxpayer may remove a portion of the underpayment from the fraud addition if he can establish that such portion is not attributable to fraud. Sec. 6653(b)(2). Prior to this amendment, if any portion of an underpayment was shown to be attributable to fraud, the entire underpayment was treated as attributable to fraud for purposes of section 6653(b)(1) of prior law even if the taxpayer proved that a portion of the underpayment was not attributable to fraud. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1274 (J. Comm. Print 1987). *507 Fraud is defined as an intentional wrongdoing intended to evade tax believed to be owing. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985) affg. T.C. Memo. 1983-249. Respondent bears the burden of proof as to the existence of fraud and must establish each element of fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265. The existence of fraud is a factual question which must be resolved by an examination of the entire record. Kotmair v. Commissioner, 86 T.C. 1253, 1259 (1986). Fraud is never presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25. However, fraud can seldom be proved by direct evidence of the taxpayer's intention. Circumstantial evidence *508 and reasonable inferences drawn from the taxpayer's entire course of conduct can be used to establish fraud. Spies v. United States, 317 U.S. 492, 499 (1943); Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Some of the "badges of fraud" include: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; (6) failure to cooperate with tax authorities; and (7) lack of credibility of the taxpayer's testimony. Laurins v. Commissioner, supra,; Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Respondent must prove by clear and convincing evidence the two elements of fraud: (1) The existence of an underpayment of tax, and (2) that some part of the underpayment is due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). Although a mere understatement of income does not establish fraud, *509 Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959), a pattern of understating income is strong evidence of fraud. Lollis v. Commissioner, 595 F.2d 1189, 1191 (9th Cir. 1979), affg. T.C. Memo. 1976-15. Respondent cannot meet her burden of establishing an underpayment due to fraud merely on the basis of petitioners' failure to meet their burden of proving error in the determination of deficiencies. Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). In this case we have clear and convincing evidence of fraud on the part of each petitioner. We have a pattern starting before 1984 and continuing at least through 1987 of petitioners having many of their personal expenses paid by WDI, charged to various WDI expense accounts, and deducted by WDI in computing its income. Mrs. Hedlund told persons who rendered services to petitioners as individuals to send the bills to WDI and even suggested the WDI account to be billed. She knew when a payment was made of her personal expenses she received a benefit from WDI. From all the evidence, particularly the fact that *510 she did not disclose what was being done in this respect to her accountant, we conclude that she knew that these amounts were income to her or her husband. Also, her testimony was evasive when she was attempting to explain why certain items were charged to WDI. Her testimony with respect to the charging of Todd's private school tuition was clearly untruthful. It is contradicted by her accountant's testimony. There is clear evidence of Mrs. Hedlund's fraud. Mr. Hedlund signed WDI's checks for many of petitioners' personal expenses. He knew that the checks of WDI were in payment of petitioners' personal expenses and that the amounts were being deducted as expenses by WDI. Mr. Hedlund had been in business for a good many years and certainly knew that an amount which he received for his own benefit from a corporation which he owned was income to him. He never told his accountant that WDI was paying his personal expenses, which indicates that he was covering up this fact. Also, insofar as this record shows, he did not question Mrs. Hedlund or Mr. Dartez about the checks of WDI which he was signing to pay his personal bills. Had he not known of the entire scheme, he would have *511 asked questions. On the basis of this record, we conclude that respondent has shown by clear and convincing evidence that some part of the underpayment by petitioners of their income tax for 1986 was due to fraud on the part of each petitioner. A showing by respondent that a portion of the underpayment is due to fraud subjects the entire underpayment to the fraud addition, unless the taxpayer can establish that some portion of the underpayment is not due to fraud. However, we consider it appropriate to comment specifically on whether petitioners were fraudulent in not reporting the $ 14,107.79 received by Mrs. Hedlund from the purchase of the Rolls Royce. The evidence is absolutely clear that Mrs. Hedlund had received over $ 109,000 for the car by way of WDI's assuming the balance on the loan and paying her over $ 45,000 cash. She had paid only $ 100,000 for the car. She tried to explain the $ 14,107.79 payment by referring to an adjustment made on WDI's books in 1985, even though she received the $ 14,107.79 in 1986. Although not completely clear, we conclude that the adjustment to WDI's books in 1985 had to do with the extra approximately $ 9,000 paid to Mrs. Hedlund which *512 appears to be the interest she paid on the car loan when she was paying it. The evidence is clear and convincing that Mrs. Hedlund knew she had been paid in 1985 everything she had paid for the car, and that she fraudulently failed to report the $ 14,107.79 received in 1986 as income. The Omnibus Budget Reconciliation Act of 1989 (the Act), Pub. L. 101-239, sec. 7721(a), 103 Stat. 2106, 2395, amended the revenue code relating to the fraud addition to tax for returns with a due date after December 31, 1989, to clarify that the burden on a taxpayer to establish what items are not attributable to fraud is by a preponderance of the evidence. One of the committee reports states that the law as it existed at the time of the Act was unclear as to the taxpayer's burden. See H. Rept. 101-247, at 1392 (1989). Respondent in her brief states that she assumes that the burden that petitioners must meet is a preponderance of the evidence burden. Therefore, in this case, there is no issue as to the extent of petitioners' burden in establishing what items are not due to fraud. We have considered all items that petitioners contend they have specifically shown not to be subject to the addition *513 to tax for fraud, if we conclude that respondent has established that some portion of the underpayment is due to fraud. We have held that petitioners have established that certain items included in their income by respondent were not for their benefit and, therefore, not income to them. These items, of course, are not income and not fraudulent. However, there are other categories of items that petitioners have failed to show were not in fact for their benefit, but have shown that the proper treatment of the items was doubtful enough to remove the underpayment resulting therefrom from the fraud addition to tax. These items are the kruggerands purchased, the health insurance paid by the company for their benefit, and the amounts paid for their expenses in connection with the horses. The record is not clear as to what became of the kruggerands. Petitioners presented evidence showing that they did give gifts to some of the officers and employees of their customers. Some of these gifts were personal "counter" gifts. Japanese have a custom of giving "counter" gifts, and this record shows that petitioners exchanged personal gifts with some of their Japanese business associates. *514 While the cost of petitioners' personal "counter" gifts might be a personal gift by petitioners since they received something in return, this would not be something petitioners would necessarily understand. There is no specific evidence that any of the "counter" gifts consisted of the kruggerands, but there is evidence that petitioners made "counter" gifts. On the basis of this record, we conclude that petitioners have shown that the underpayment resulting from the inclusion in their income because of the purchase by WDI of the kruggerands was not due to fraud. At the time that WDI made health insurance payments on behalf of petitioners, WDI also made such payments for a few other employees. Although the record shows that these payments for petitioners were not deductible by WDI and were income to petitioners, treating the item otherwise appears to be an honest mistake on the part of petitioners and not fraudulent. Mr. Hedlund, during 1986 and for some years prior thereto, had a business connected with the raising or training of horses. The validity of this business was not questioned in this case. In fact several times Mr. Hedlund referred to the fact that respondent had recognized *515 this activity as a business activity. WDI paid a total of $ 1,020.23 of charges by Mr. Hedlund to an American Express card for trips in connection with his horse business. Clearly, this was a personal expense of Mr. Hedlund paid by WDI and, therefore, income to Mr. Hedlund. If he had been able to show that he could substantiate this amount as a proper business expense deduction in connection with his horse business, which petitioners did not contend he could from the records he has, the amount of this income might have been offset by a business expense deduction. However, the record is insufficient to support such a deduction and petitioners apparently do not contend otherwise. However, they do contend that the deduction of the amount was not fraudulent. We agree with petitioners that they have made a sufficient showing with respect to the $ 1,020.23 of income from payment by WDI of some items related to their horse business to show that the omission of these items of income was not fraudulent, and we hold that the addition to tax for fraud does not apply to the underpayment relating to this $ 1,020.23. An addition to tax for negligence or intentional disregard of rules or *516 regulations is imposed by section 6653(a). The amount of the addition under section 6653(a)(1)(A) is 5 percent of the underpayment. This addition applies if any part of the underpayment is attributable to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) provides for a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Under section 6653(a)(2) any portion of the underpayment which is subject to the addition to tax for fraud is not taken into account in determining the underpayment to which the addition to tax for negligence applies. Negligence encompasses any failure to reasonably attempt to comply with the Internal Revenue Code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do in a similar situation. McGee v. Commissioner, 979 F.2d 66, 71 (5th Cir. 1992), affg. T.C. Memo. 1991-510. Since respondent determined the addition to tax for negligence as an alternative to the addition to tax for fraud in the notice of deficiency, petitioners bear the burden of *517 showing that the addition to tax for negligence is inapplicable to the portion of the underpayment not due to fraud. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. T.C. Memo. 1981-675. In this case, petitioners did not explain to their accountant that they were not including in their income amounts paid on their behalf by WDI. Had they discussed these items with their accountant, he could have advised them of the fact that the payments by WDI on their behalf were income. Also, petitioners had these items included in expense accounts of WDI. Based on this record, we conclude that petitioners have failed to show that the underpayment resulting from omissions from their income in 1986 which they have shown not to be fraudulent, was not due to negligence. Subject to certain exceptions not here applicable, section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income *518 tax. An understatement is defined as the tax required to be shown on the return, less the tax shown on the return, reduced by any rebates. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioners made no specific argument that section 6661 is not applicable to these understatements of tax aside from the argument as to the amount of the tax. Therefore, we sustain the addition to tax under section 6661(a) if the recomputation under Rule 155 shows that the understatement of tax exceeds the 10 percent of tax required to be shown on the return or $ 5,000, whichever is greater. Decision will be entered under Rule 155.
Footnotes
1. 50 percent of the interest due on $ 94,311.↩
2. 50 percent of the interest due on $ 139,565.↩
1. This check was for payment of invoice No. 1185.↩
2. This check was for payment of invoice No. 1219.↩
1. The entry in the case disbursements journal that records this check says that it is for test booths.↩
1. The amounts of the adjustments to income in the notice of deficiency, the amounts conceded by each party, and the amounts still in controversy are as follows: Adjustment
Amounts
Amounts to income conceded conceded
Remaining
per stat. by by
in notice
petitioners
respondent
dispute
Masonry work
$ 2,127
$ 2,127
-0- -0- Kruggerands
17,087
$ 17,087
Glass windbreaker
3,169
3,169
-0- -0- Furniture
22,707
12,902
$ 9,805
-0- Household furnishings
1,828
1,828
-0- -0- Cost of goods sold and
general and adminis-
trative expense
charges to WDI
127,807
61,611
48,199
17,997
Credit card payments
104,605
51,347
65
53,193
Lawsuit expense
188,621
-0- 188,621
-0- Dividend exclusions
(200)
(200)
-0-
-0- Totals
467,751
132,784
246,690
88,277
Of the items charged to cost of goods sold and general and administrative expenses conceded by respondent, $ 40,895.01 is an attorney's fee to Edward Djang and the remaining $ 4,543 of this fee is conceded by petitioners to be personal and to be income to them. Petitioners specifically question the following items charged to cost of goods sold and general and administrative expenses as being for petitioners' personal benefit in 1986: (1) A $ 1,000 check to Duncan Sato, an employee of Hitachi Sales; (2) a $ 1,035.40 check to Budd Brunn-Poly Sales, a business that sold sheets of polyurethane; (3) a check for $ 2,200 to Jerry Huto for an ornamental gate; (4) four checks totaling $ 632 to petty cash; and (5) payments by WDI of petitioners' health insurance in 1986.↩
2. SEC. 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD.-- (b) Fraud.-- (1) In General.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of-- (A) 75 percent of the portion of the underpayment which is attributable to fraud, and (B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax. (2) Determination of Portion Attributable to Fraud. --If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer established is not attributable to fraud.
(3) Special Rule for Joint Returns.--In the case of a joint return, this subsection shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse.↩